MARGOLES, Appellant, v. STATE BOARD OF MEDICAL EXAMINERS, Respondent.

*No. 254.   Argued April 30, 1970.—Decided June 5, 1970.*
(Also reported in 177 N. W. 2d 353.)

502

For the appellant there were briefs by *Callahan & Arnold* of Columbus, attorneys, and *Steven J. Caulum* of Madison of counsel, and oral argument by *Carroll B. Callahan.*

For the respondent the cause was argued by *Le Roy L. Dalton,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

BEILFUSS, J.    The issues are:

1.    May the medical examining board consider matters outside the confines of the 1969 formal hearing record representing petitioner's moral and professional character in deciding whether to recommend restoration of a revoked medical license under sec. 147.20 (4), Stats.?

2.    Is there substantial evidence in the record as submitted to sustain the findings of the medical examining board?

The statute governing restoration of a revoked medical license is sec. 147.20 (4), Stats.:

"When a license or certificate is revoked no license or certificate shall be granted thereafter to such person. Any license or certificate heretofore or hereafter revoked may be restored by subsequent order of the trial court, but only after a first revocation, upon notice to

the district attorney who prosecuted, or, in the event of his disability, his successor in office, upon written recommendation by the state board of medical examiners, and upon findings by the court that the applicant for restoration of license or certificate is presently of good moral and professional character and that justice demands the restoration."

The court which revoked petitioner's license, the circuit court for Milwaukee county, is apparently of the opinion it is not obligated under this statute to hear the petition to restore a medical license without a favorable recommendation from the board of medical examiners. The language of the statute respecting the type of findings to be made is determinative of the court's duty, not that of the board, but the statute certainly provides the only guideline available for the board in reaching its decision on a recommendation. Therefore, both the petitioner and the board agree its duty in making a recommendation is to consider the applicant's moral and professional character and whether justice demands the restoration.

In the absence of a determination by the revoking court on this matter, the sole manner of relief available to the petitioner is to pursue an appeal under the provisions of ch. 227, Stats., to subject the action of the board as an administrative body to judicial review.

A prime dispute between the parties to this appeal is whether the relicensing proceeding here is legislative or quasi-judicial in nature. Petitioner asserts the factual issue in dispute respecting his good moral and professional character is an adjudicative fact as distinguished from a legislative fact and cannot be determined without violating procedural due process unless decided on evidence adduced at a trial-type hearing.

Based upon this court's language in *Ashwaubenon v. State Highway Comm.* (1962), 17 Wis. 2d 120, 115 N. W. 2d 498, the circuit court determined the instant case was

legislative in nature and involved a noncontested case with no hearing required by law. It was said in *Ashwaubenon, supra,* pages 126, 127:

"We are convinced that the hearing was merely a part of the investigative processes of the commission and was to aid the commission in its comprehension of the problems involved. Therefore, judicial review of the commission's decision would properly include all the materials and reports which were considered by the commission even though they were received outside of the formal hearing and in an *ex parte* manner. Accordingly, it was not appropriate for the circuit court to exclude from the record to be reviewed the supplemental materials which constituted the commission's files and interdepartmental correspondence.

"The so-called fair-play provisions of ch. 227 (secs. 227.07–227.13, Stats., inclusive) do not apply to the case at bar because this is not a 'contested case.' Although a legislative-type hearing does not necessarily preclude the matter from being a contested case, we are unable to find a contested case in the matter at hand."

The Administrative Procedure Act defines a contested case in sec. 227.01 (2), Stats., as follows:

"(2) 'Contested case' means a proceeding before an agency in which, *after hearing required by law,* the legal rights, duties or privileges of any party to such proceeding are determined or directly affected by a decision or order in such proceeding and in which the assertion by one party of any such right, duty or privilege is denied or controverted by another party to such proceeding." (Emphasis supplied.)

In discussing the statutory definition of a contested case, particularly in regard to the controversion of a right, duty or privilege, this court said in *Hall v. Banking Review Board* (1961), 13 Wis. 2d 359, 366, 367, 108 N. W. 2d 543:

"In the administrative proceeding now under consideration, the applicants were seeking the grant of a

privilege [to organize as a state bank]. An unfavorable report of a representative of the banking department was before the board. A pertinent consideration was the adequacy of banking service in the community and a bank which was providing service in the community opposed the application.

"We conclude that the proceeding was a contested case, and that sec. 227.13, Stats., applied.

"The report of the examiner is not part of the record on appeal. We know only that it was termed unfavorable in the minutes of the board. It may be that this proceeding was a contested case by reason of the position taken by the examiner. It is true that the definition of 'contested case' refers to a 'party' controverting the right, duty, or privilege of another party, but we conclude that the term 'party' does not restrict the definition to proceedings where issues are contested between private parties. The reason for the rules of fair play is at least as great where issues controlling the legal rights, duties, or privileges of a private party are actively contested by the agency or its representatives as when they are contested by another private party."

The type of interest necessary to create an adversary situation within the scope of sec. 227.01 (2), Stats., was further delineated in *Ashwaubenon, supra,* where it was said, at page 128:

"When the legislature defined a contested case in sec. 227.01 (2), Stats., it contemplated some special interest such as occurred in *Hall v. Banking Review Board* (1961), 13 Wis. (2d) 359, 108 N. W. (2d) 543. The location of a bank is a matter of public interest just as is the location of a highway. However, the order in the case at bar relocating a highway affects all nearby or traversed municipalities and landowners, whereas in the bank case there was a particularized and adversary interest affecting both the proposed new bank and the existing bank."

In addition to requiring an adversary contest, sec. 227.01 (2), Stats., does not characterize a case as "contested" unless a hearing is "required by law." As stated above, the circuit court determined no trial-type hearing

was required on all matters considered by the board because this was a "legislative" type case.

The wisdom of attempting to draw a legislative-judicial distinction in administrative agency cases was criticized by Professor Kenneth Davis in *The Requirement of a Trial-Type Hearing*, 70 Harv. L. Rev. (1956), 193, 202:

"One obvious reason why whole proceedings cannot properly be labeled 'judicial' or 'legislative' is that in a single proceeding a tribunal commonly acts both judicially and legislatively. The process of resolving disputed facts about particular parties is the essence of the judicial process and calls for a trial type of hearing."

In addition to criticizing the distinction, Professor Davis further states that if the classifications are to be used, a matter is properly defined as "legislative" only if determining general law or policy, and "adjudicative" if pertaining to particular facts about a party such as his fitness to engage in a particular profession. 70 Harv. L. Rev. (1956), 203.[1] Moreover, he stated that in determining if due process requires a trial-type hearing:

"The crucial question is not characterization of the whole proceeding as judicial or nonjudicial but the presence or absence of issues of adjudicative facts." *Id.* at page 204.

Dr. Margoles has not been denied a formal hearing by the board of medical examiners but he contests the fact that certain of the board's findings and conclusions were based on matters not presented at the hearing. Respecting this alleged denial of a right to confrontation of portions of the record obtained other than at the 1969 hearing, he relies upon the decisions of the United States Supreme Court in *Willner v. Committee on Character* (1963), 373 U. S. 96, 83 Sup. Ct. 1175, 10 L. Ed. 2d 224, 2 A. L. R. 3d 1254, and *Goldsmith v. Board of Tax Ap-*

---

[1] *See Hornsby v. Allen* (5th Cir. 1964), 326 Fed. 2d 605, 608.

*peals* (1926), 270 U. S. 117, 46 Sup. Ct. 215, 70 L. Ed. 494.

In *Willner* the court was presented with a New York state bar admission procedure that involved the appointment of a special committee by the Appellate Division of the State Supreme Court to investigate the character and fitness of applicants. The rules provided that no applicant would be admitted to practice without a favorable recommendation from the committee. The committee consistently refused to certify the petitioner; moreover, it revealed only certain items of correspondence to him upon which his application was being denied and refused to grant him a hearing on the grounds for his rejection.

In reversing the lower court's approval of the committee procedure the supreme court said in *Willner, supra,* at pages 102, 103:

"The issue presented is justiciable. 'A claim of a present right to admission to the bar of a state and a denial of that right is a controversy.' *In re Summers,* 325 U. S. 561, 568. Moreover, the requirements of procedural due process must be met before a State can exclude a person from practicing law. 'A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment.' *Schware v. Board of Bar Examiners,* 353 U. S. 232, 238–239. As the Court said in *Ex parte Garland,* 4 Wall. 333, 379, the right is not 'a matter of grace and favor.'

"We are not here concerned with grounds which justify denial of a license to practice law, but only with what procedural due process requires if the license is to be withheld. . . .
" . . .
"We have emphasized in recent years that procedural due process often requires confrontation and cross-examination of those whose word deprives a person of his livelihood. See *Greene v. McElroy,* 360 U. S. 474, 492, 496–497, and cases cited. That view has been taken by several state courts when it comes to procedural due process and the admission to practice law. *Coleman v.*

*Watts,* 81 So. 2d 650; *Application of Burke,* 87 Ariz. 336, 351 P. 2d 169; *In re Crum,* 103 Ore. 296, 204 P. 948; *Moity v. Louisiana State Bar Assn.,* 239 La. 1081, 121 So. 2d 87. Cf. *Brooks v. Laws,* 208 F. 2d 18, 33 (concurring opinion). We think the need for confrontation is a necessary conclusion from the requirements of procedural due process in a situation such as this. Cf. *Greene v. McElroy, supra; Cafeteria Workers v. McElroy,* 367 U. S. 886."

We do not deem the due process procedures afforded the petitioner in *Willner* are at all akin to those extended to Dr. Margoles.

It is our opinion that upon the question of Dr. Margoles' moral and professional character he was entitled to an adjudicative hearing. It is our further opinion that he was afforded such hearing and that he has not been denied the "fair play" procedures demanded by due process.

The certificate of Dr. Thomas W. Tormey, Jr., secretary of the medical examining board, sets forth that the record filed in the circuit court and now in this court "was the record considered by the Board in making its findings of fact, conclusions of law and decision of April 30, 1969." The record contains 1325 pages. From page 387 to the end deals with the adversary hearing of January 16, 17 and 18, 1969. The testimony taken is from pages 464 to 1083, and the exhibits received from pages 1084 to 1263. The first hearing in 1965 was likewise an adversary proceeding with Dr. Margoles represented by competent counsel. The proceeding appears at pages 10 to 380 of the record. The only unaccounted pages between 10 and 1325 are 381–386, which consist of a letter of Dr. Margoles' counsel and his own affidavit, in 1967, in which he tried to induce the board to issue a Wisconsin license to be used for the sole purpose of obtaining an Illinois license and the board's denial of this obvious unethical procedure.

The records of the 1965 and 1967 proceedings were available to Dr. Margoles and his counsel prior to the 1969 hearing. The board had an investigator, Mr. La Verne Stordock. Mr. Stordock made an investigation and filed a report with the board which was adverse to Dr. Margoles. The contents of this report were made known to Dr. Margoles and his counsel. Dr. Margoles' counsel, orally and by written documentation, gave information tending to refute every adverse statement or report given by Mr. Stordock.

At the hearing in January, 1969, a wide range of matters concerning Dr. Margoles and his problems from 1960 to the date of the hearing were covered. Most of the subjects were opened either by Dr. Margoles or John Diuguid, an attorney from Washington, D. C., who represented Dr. Margoles in several of his efforts to obtain medical licenses. Others were testified to (by means of deposition) by Dr. E. C. Swanson, executive secretary of the state board of registration in medicine for Michigan, and Dr. Joseph L. Riley, an associate of Dr. Margoles.

The burden to prove that he had changed,—that he was of good moral and professional character and entitled to practice medicine (there is no question of his technical competence)—was upon Dr. Margoles.[2] Under the statute the board was required to make some investigation on behalf of the public. In our opinion the board did provide a fair adversary hearing in which Dr. Margoles had an opportunity to present his case and refute any adverse information the board had.

In a ch. 227, Stats., review, the test we apply to a challenge to the sufficiency of the evidence is the "substantial evidence" test.

---

[2] *Housman v. Board of Medical Examiners* (1948), 84 Cal. App. 2d 308, 190 Pac. 2d 653; *State v. Louisiana Board of Medical Examiners* (1959), 238 La. 502, 115 So. 2d 833.

In *Robertson Transportation Co. v. Public Service Comm.* (1968), 39 Wis. 2d 653, 658, 159 N. W. 2d 636, we said:

"Substantial evidence is not equated with preponderance of the evidence. There may be cases where two conflicting views may each be sustained by substantial evidence. In such a case, it is for the agency to determine which view of the evidence it wishes to accept. Likewise, there are cases where only one view can be supported by substantial evidence and the determination depends upon the credibility of witnesses."

The board's findings of fact, conclusions of law and recommendation are reprinted with appellant's appendix. The first two findings detail the petitioner's convictions in the United States District Court. The third finding reflects a conflict in Dr. Margoles' testimony at the bribery trial in 1960, and the restoration hearing held before the board in 1965. It is argued, and rightfully so, that the conflict in testimony in 1965 is a solid basis for declaring at that time the petitioner was not rehabilitated. Parts of the 1965 testimony were read to Dr. Margoles at the 1969 hearing and he stated they were true in 1965 and true in 1969. The board was justified in using prior statements of record to declare his credibility impeached.

The fourth and fifth findings pertain to the manner in which the petitioner completed his application for licensing with the State of Michigan Board of Registration in Medicine. The Wisconsin board indicated Dr. Margoles misled the executive secretary of the Michigan board, Dr. E. C. Swanson, by failing to fully disclose the number of professional complaints filed against him and the complete list of crimes of which he had been convicted. Dr. Margoles answered the question respecting criminal convictions by writing, "1960 Internal Revenue Code Violation and Complication."

A deposition of Dr. Swanson was taken, including full cross-examination, and introduced at the hearing. The testimony of Dr. Swanson could lead to a reasonable inference that the criminal conviction, other than the Internal Revenue Code violations, was not fully disclosed on the initial application. He stated Dr. Margoles did not inform him that he had been imprisoned. Dr. Margoles also failed to indicate on his Michigan application the professional complaints filed against him with the Milwaukee County Medical Society. There is sufficient evidence in the record that has been subjected to petitioner's confrontation to uphold findings four and five.

Finding six relates to the type of examination taken by petitioner in Michigan and his representations of it to the Wisconsin board. The sole authority for the board's position is that Dr. Margoles failed to inform it this was an abbreviated examination. The type of examination is revealed by Dr. Swanson in his deposition. The factual basis for the inference of having been misled is in the record. The examination was a short two to four hour "legalizing" examination rather than an ordinary three-day examination.

Finding seven indicates the petitioner presented an inaccurate financial statement in an attempt to mislead the board. Dr. Margoles testified he was completely divorced from his financial affairs, having turned everything over to his attorneys and an accounting firm to manage. His general testimony respecting the values of various assets is different from the statements prepared by his accountants and lends a reasonable inference that he intentionally misled the board as to his financial affairs and his financial position.

Finding eight dealt with a charge of intentionally misleading a newspaperman and the board regarding the number of malpractice suits filed against the petitioner. The evidence relied on for this conclusion is an excerpt

from the Congressional Record reprinting a news story from an Iowa newspaper of June 5, 1966, and his testimony at the 1969 hearing. The evidence sustains the fact that Dr. Margoles intended to give the impression that he was involved in only one malpractice claim but, upon confrontation during his cross-examination, he admitted three.

Finding nine relates to petitioner's inability to accept his own guilt and his placing of blame on the sentencing judge and governmental agencies. There was competent testimony in the record in the deposition of Dr. Joseph Riley of Michigan to support the finding of the board on this issue.

Finding 10, that petitioner is licensed to practice in various states, is undisputed.

Finding 11 recites the 1965 testimony of an examining psychiatrist detailing his opinion of petitioner's inability to practice medicine without supervision. In 1965, Dr. Margoles' witness, Dr. Jefferson, so testified. Dr. Margoles left the board with this impression and offered no testimony that this condition had changed or improved.

A complete review of the extensive record convinces us that the findings of fact are based upon substantial evidence and that the findings support the conclusions of law and decision reached by the board.

*By the Court.*—Judgment affirmed.